UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

v.

D-1  NANCY JUANITA WILLIAMS,
D-2  ANDREA JEAN BRADLEY-BASKIN,
D-3  AVERY JAMES BRADLEY,
D-4  DWIGHT HASSAN RASHAD

Defendants.

_____/

Case: 2:26-cr-20045
Assigned To : Leitman, Matthew F.
Referral Judge: Patti, Anthony P.
Assign. Date : 1/28/2026
Description: INDI USA V SEALED
MATTER (TM)

Violations:
18 U.S.C. § 1349
18 U.S.C. § 1343
18 U.S.C. § 1957
18 U.S.C. § 1001(a)(2)

## INDICTMENT

The Grand Jury charges:

## GENERAL ALLEGATIONS

1.     In Michigan, probate courts appoint guardians to care for persons who are
adjudicated an incapacitated person ("ward"), and who are found unable to care for
themselves and manage their personal and financial affairs.  Often these wards are
elderly persons who cannot physically care for themselves and lack the capacity to
arrange care for themselves.  Frequently, these wards have no family members or
other persons to arrange for their care.   Occasionally, wards are not elderly but are
otherwise mentally or physically incapacitated and unable to care for themselves.

1

2.      Wayne County Probate Court (WCPC) appoints guardians for incapacitated

wards.  Court appointed guardians are required to act in the best interests of their

wards. Guardians are responsible for the care, comfort, maintenance, and custody

of their wards.  Guardians may be responsible for selecting appropriate residences

for their ward.  (Court appointed guardians are required to ensure that their wards

receive required medical services.)

3.      Court appointed guardians are entrusted by the court as fiduciaries to

safeguard the wards' assets, including their clothing, furniture, vehicles, personal

effects, bank accounts, life insurance policies, retirement/pension accounts, social

security income, real estate, and any other assets, income, or property owned by

the ward.  Court appointed guardians are required by law to use the wards' assets

exclusively for the benefit of the ward and to avoid conflicts of interest or

decisions that benefit the guardian.  Court appointed guardians are prohibited from

investing the wards' assets in businesses owned or controlled by the guardian and

they are not allowed to borrow the wards' funds for their own personal use.

4.      In addition to appointing guardians, probate courts in Michigan may also

appoint conservators for incapacitated wards.  Court appointed conservators are

likewise fiduciaries required by law to act in the best interests of their wards.  A

conservator's primary duties are to preserve the ward's assets and to expend them

for the support, education, care, and benefit of the ward and any dependents.

Unlike guardians, conservators have the authority to make financial decisions for their wards.  Conservators have the authority to take possession, collect, preserve, manage, and dispose of a ward's assets.  They may also dispose of a ward's real property, if authorized by the probate court.

5.      The duties of a conservator are governed by the Michigan Prudent Investor Rule, MCL 700.1501, *et seq*, which require that a conservator must invest a ward's assets as a prudent investor would.  To satisfy this standard, conservators are required to act solely in the interest of the ward and must exercise reasonable care, skill, and caution.

6.      When a probate court appoints a guardian or a conservator, it issues Letters of Authority which allow the guardian or conservator to exercise their authority with respect to the ward.  The Letters of Authority are valid for one year and provide guidelines that the guardian and conservator should follow, including:

> a.   One bank account for each ward should be maintained with a caption such as "Estate of John Doe, a minor";
>
> b.   All checks payable to the ward must be deposited into the bank account;
>
> c.   A copy of all bank statements, checks written, and receipts should be retained;
>
> d.   Checks should be used where possible so that there is

documentation of spending on behalf of the ward;

e.  All spending must only be used to benefit the ward and not the

fiduciary or family members

7.     Court appointed guardians are required to file annual and final reports with the Probate Court detailing actions taken with respect to the ward.  The annual report contains information on where the ward resides, the ward's physical health, the ward's mental health, and the ward's social activities. Guardians are not required to file an accounting of the ward's income, expenses, or assets.  Once an annual report is filed with the Probate Court, the court will issue new Letters of Authority for the guardian if the guardianship is to continue.

8.     Likewise, court appointed conservators are required to file annual and final reports with the Probate Court.  The annual report should be an accounting that lists the assets of the ward and the ward's income and expenses for the previous year.  Once an annual report is filed with the Probate Court, the court will issue new Letters of Authority for the conservator, if the conservatorship is to continue.

9.     Comerica Bank is a financial services company headquartered in Dallas, Texas, which has branches and offices located in the Eastern District of Michigan.

10.     Citizens Bank is a financial services company headquartered in Providence, Rhode Island, which has branches and offices located in the Eastern District of Michigan.

11.     Huntington Bank is a financial services company headquartered in Columbus, Ohio, which has branches and offices located in the Eastern District of Michigan.

12.     Bank of America is a financial services company headquartered in Charlotte, North Carolina, which has branches and offices located in the Eastern District of Michigan.

*Defendant Nancy Williams*

13.     Beginning in 2016, NANCY WILLIAMS owned and operated Guardian & Associates, a guardianship agency in metropolitan Detroit. Guardian & Associates was appointed as fiduciary for incapacitated persons in about 1,000 cases in the Wayne County Probate Court.  As court appointed fiduciary, WILLIAMS had access to wards' assets, including bank accounts, social security checks, retirement/pension income, homes, and other personal property.  Guardian & Associates would occasionally also be appointed as conservator for wards. Guardian & Associates operated from 21751 Coolidge Highway, Oak Park, Michigan.

14.     WILLIAMS maintained a depository bank account for Guardian &
Associates at Citizens Bank.   WILLIAMS also maintained depository bank
accounts for her incapacitated wards at Citizens Bank and Comerica Bank.

15.     As court appointed guardian, WILLIAMS was required to annually file
reports with the WCPC on the condition of the wards. As a conservator,
WILLIAMS was required to file annual accountings with the WCPC.

16.     In June 2023, based on a conviction for election fraud, WILLIAMS was
suspended as guardian in all pending cases by WCPC.

17.     In January 2024, after an internal investigation by the WCPC, Guardian &
Associates was removed as guardian and conservator for all pending cases in
WCPC.

*Defendants Andrea Bradley-Baskin and Avery Bradley*

18.     At all times relevant to this Indictment, ANDREA BRADLEY-BASKIN
was an attorney licensed to practice law in the state of Michigan.

19.     At all times relevant to this Indictment, AVERY BRADLEY was an
attorney licensed to practice law in the state of Michigan.

20.     From about at least 2016, AVERY BRADLEY and his daughter,
ANDREA BRADLEY-BASKIN, operated The Bradley Law Center providing
legal services to clients.  As part of their practice, The Bradley Law Center
provided legal services for matters pending in Probate Court.  These legal services

included legal representation of guardians, conservators, and wards. BRADLEY

and BRADLEY-BASKIN routinely represented Guardian & Associates and

received substantial attorney fees and other funds from the bank accounts of

Guardian & Associates' wards. The Bradley Law Center also operated from 21751

Coolidge Highway, Oak Park, MI.

21.    On or about May 22, 2023, ANDREA BRADLEY-BASKIN left the Bradley

Law Center to become general counsel to the 36th District Court. After leaving the

Bradley Law Center, BRADLEY-BASKIN continued to receive payments from

the bank accounts of Guardian & Associates' wards. In 2024, BRADLEY-

BASKIN was elected as a judge and as of January 1, 2025, she serves as a district

judge for the 36th District Court.

24.    AVERY BRADLEY continues to practice law in Michigan.    After the

WCPC suspended NANCY WILLIAMS in June of 2023, AVERY BRADLEY

became an agent for Guardian & Associates and took control of all cases pending

in the court, and WILLIAMS maintained practical control of Guardian &

Associates.

26.    ANDREA BRADLEY-BASKIN and AVERY BRADLEY maintained

depository bank accounts at Citizens Bank and Comerica Bank.

27.    ANDREA BRADLEY-BASKIN also maintained depository bank accounts

at Huntington Bank.

*Defendant Dwight Rashad*

22.　　DWIGHT RASHAD owned and operated Empowerment Homes and Sims Residential Holdings. Empowerment Homes operated residential group homes that provided housing and home care services for individuals needing support.  All wards placed in Empowerment Homes were wards of Guardian & Associates.

23.　　DWIGHT RASHAD maintained depository accounts at Bank of America for Empowerment Homes, LLC and Sims Residential Holdings.

24.　　As court appointed guardian, WILLIAMS placed wards in homes owned and operated by RASHAD.   WILLIAMS authorized payments from these wards' accounts of up to $6,000 a month and a total of approximately $2,000,000 to Empowerment Homes.

25.　　WILLIAMS, BRADLEY, and BRADLEY-BASKIN sold at least five homes owned by wards of Guardian & Associates to Sims Residential Holdings and to RASHAD.

26.　　While acting as a court appointed guardian and authorizing payments to Empowerment Homes to care for and to house her wards, and selling real estate owned by her wards to RASHAD, WILLIAMS was residing with RASHAD in a home in the Eastern District of Michigan. WILLIAMS was the named beneficiary

on at least two of RASHAD's bank accounts, and she drove a 2023 Jeep Grand Cherokee which was registered to Empowerment Homes, LLC.

**COUNT ONE**
18 U.S.C. § 1349
*Conspiracy to Commit Wire Fraud*

D-1   NANCY WILLIAMS
D-2   ANDREA BRADLEY-BASKIN
D-3   AVERY BRADLEY
D-4   DWIGHT RASHAD

27.    From at least in or on January 2017, through at least in or around July 2024 in the Southern Division of the Eastern District of Michigan, and elsewhere, the defendants, NANCY WILLIAMS, ANDREA BRADLEY-BASKIN, AVERY BRADLEY, and DWIGHT RASHAD, along with others known and unknown to the Grand Jury, did knowingly and intentionally,  combine, conspire, confederate, and agree to commit wire fraud, that is, defendants knowingly, intentionally, and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing such pretenses, representations, and promises were false and fraudulent when made, transmit and cause to be transmitted, by means of wire, radio, and television communication, writings, signals, pictures, and sounds in interstate and foreign commerce for the

purposes of executing such scheme and artifice, in violation of Title 18, U.S.C., Section 1343.

### Object of the Conspiracy

28.    The object of the conspiracy was for the defendants to enrich themselves and their associates by embezzling funds and using false and fraudulent pretenses, representations, and promises to obtain and keep money and property that belonged to multiple incapacitated wards.

### Manner and Means

29.    The defendants used their positions of trust to embezzle, misappropriate, and steal funds and property belonging to incapacitated wards.  Defendants NANCY WILLIAMS and AVERY BRADLEY wrote and obtained unauthorized checks drawn on incapacitated wards' bank accounts.  Those checks were deposited into bank accounts NANCY WILLIAMS, ANDREA BRADLEY-BASKIN, AVERY BRADLEY, and DWIGHT RASHAD controlled.

30.    To obtain the stolen funds after depositing fraudulently obtained checks, WILLIAMS, BRADLEY-BASKIN, BRADLEY, and RASHAD withdrew the stolen funds in cash, or wrote checks to pay for goods or services the defendants wanted, unrelated to care of the wards.

31.    In addition to writing unauthorized checks on wards' accounts, the defendants also withdrew cash directly from the wards' accounts, for services not provided or for services unrelated to the care of the wards.

32.    The defendants also sold real property belonging to wards to RASHAD or associates of RASHAD or purchased property belonging to wards for themselves at below market value.  On at least one instance, the defendants failed to seek authority from the WCPC to sell the wards' real estate.  When they did seek the court's permission, the defendants failed to disclose the relationship between the parties.  The defendants filed false and misleading deeds to cover their theft.

33.    To conceal their theft and embezzlement from WCPC, the incapacitated wards, and the wards' heirs, the defendants routinely prepared false and misleading documents, invoices, bills, deeds, and other materials.

34.    In furthering the conspiracy and seeking to achieve its purpose, the defendants regularly used and caused the use of interstate wire transmissions

35.    Specific examples of the manner and means by which the defendants accomplished the object of the conspiracy include, among others, the following:

**Theft from H.B.**

36.    On or about June 8, 2017, the WCPC appointed Guardian & Associates as temporary guardian for H.B. The WCPC later appointed Guardian & Associates full guardian for H.B.

37.    On or about October 24, 2017, BRADLEY filed an appearance in H.B.'s case with the WCPC as an attorney representing Guardian & Associates.

38.    Guardian & Associates opened bank accounts for the Estate of H.B. at two banks – Citizens Bank and Comerica Bank. WILLIAMS used H.B.'s Citizens Bank account to pay H.B.'s routine living expenses. The Citizens Bank account was replenished monthly as WILLIAMS deposited H.B.'s social security checks and other sources of income into the account. On December 16, 2017, the account at Citizens Bank had a balance of $13,702.36. On December 22, 2017, the account at Comerica Bank had a balance of $308,327.31.

*Empowerment Homes*

39.    On or about December 9, 2017, WILLIAMS moved H.B into an Empowerment Homes, LLC residence owned by RASHAD. Acting on behalf of H.B. as guardian, WILLIAMS signed multiple rental agreements with Empowerment Homes agreeing to pay $3,000 per month to house H.B. WILLIAMS caused checks to be issued from H.B.'s Citizens Bank account each month for rent in amounts varying from $3,000 to $4,000.

40.    In addition to the monthly rent payments from H.B.'s Citizens Bank account, WILLIAMS caused checks to be issued to Empowerment Homes from H.B.'s account at Comerica Bank. From January 7, 2018, to June 21, 2019, WILLIAMS caused nine $24,100 checks to be issued from H.B.'s Comerica Bank

12

account to Empowerment Homes. On September 18, 2019, WILLIAMS caused a

$18,568.58 check to be issued to Empowerment Homes, which brought the

account balance at Comerica Bank for the H.B. Estate to $0.00. The checks from

H.B.'s account at Comerica Bank, totaling $235,468.58, were not used for the

benefit of H.B. WILLIAMS fraudulently paid the money to benefit RASHAD.

### *Andrea Bradley-Baskin Rent Payment, Westland*

41.    On February 6, 2018, WILLIAMS caused a $25,000 check to be issued from

the Estate of H.B.'s account at Comerica Bank. The $25,000 check was payable to

ASR Property.

42.    On or about February 8, 2018, BRADLEY-BASKIN signed a lease from

ASR Properties to rent a house on Shelby Drive in Westland, MI.   BRADLEY-

BASKIN used the $25,000 check that WILLIAMS issued from H.B.'s Comerica

account to pre-pay her rent on the Westland property for one year.  The $25,000

check was not used for the benefit of H.B. WILLAMS fraudulently issued the

check to benefit BRADLEY-BASKIN.

### *Fictitious Settlement*

43.    On or about August 1, 2018, BRADLEY-BASKIN drafted and signed a

letter to Guardian & Associates, in care of Nancy Williams, on Bradley Law

Center, PLLC letterhead which stated:

> Our firm has diligently worked to resolve the civil matter involving your
> consumer, and are happy to report that the pre-suit counter-offer was

accepted and full and final release of the claim will be signed upon receipt of the settlement check by the claimant in the amount of $36,438.27. Our firm will maintain the confidentiality required in this matter and in doing so shall issue the settlement check. To that end, please provide a check to (sic) payable to our IOLTA account so that we may proceed towards resolution.

44.    That same day, WILLIAMS caused a $36,438.27 check to be issued from H.B.'s Comerica Bank account to the Bradley Law Center with the memo "Final Settlement." BRADLEY-BASKIN endorsed the check, which was deposited into a Bradley Law Center Citizens Bank account.

45.    No settlement check was ever issued to any supposed "claimant." Instead, the next day, August 2, 2018, BRADLEY-BASKIN withdrew $14,000 in cash from that Citizens Bank account. On August 3, 2018, BRADLEY withdrew $9,000 in cash from that Citizens Bank account. The $36,438.27 check was not used for the benefit of H.B. WILLIAMS fraudulently issued the check to benefit BRADLEY-BASKIN and BRADLEY.

*$5,000 Check*

46.    On or about January 17, 2018, WILLIAMS caused a $5,000 check to be issued from H.B.'s Comerica Bank account payable to the Estate of H.B. WILLIAMS deposited the $5,000 in Guardian & Associates' Citizens Bank account. The $5,000 check was not used for the benefit of H.B. WILLIAMS fraudulently issued the check to benefit WILLIAMS.

14

*Sale of H.B.'s home*

47.     According to L.W, a friend and associate of RASHAD, in 2017 or 2018, RASHAD asked L.W. if he was interested in buying H.B.'s home on Steel Street in the City of Detroit. L.W. claimed that he purchased the home for $5,000 and gave the cash to H.B. There is no record of H.B. receiving the cash or depositing it into her bank account. At that time, a quit claim deed was filed on October 28, 2018, stating that H.B. sold her home to L.W. for $1.

48.     On or about January 22, 2019, BRADLEY-BASKIN filed an affidavit to correct the quit claim deed, claiming that there was a "scrivener's error" in the deed and that the date of the sale should have been July 2015. July 2015 predates the guardianship for H.B. being issued by WCPC and was before H.B. was declared incapacitated by the court.

49.     On or about March 22, 2019, a new quit claim deed was filed indicating that H.B.'s home on Steel Street was sold on July 6, 2015. This was done to make it appear that HB transferred the home to L.W. in an arm's length transaction, when in reality, H.B.'s home was sold by coconspirators of RASHAD at a time that H.B. was legally incapacitated and unable to make informed decisions. As of October 2025, L.W. still resides at the home on Steel Street.

50.     On or about July 20, 2023, WILLIAMS filed her last annual report for H.B. with WCPC, recommending that the guardianship be continued because the ward could not make informed decisions.

**Theft from J.W.**

51.     On or about February 28, 2018, the WCPC appointed Guardian & Associates as guardian for J.W.

52.     On April 2, 2018, WILLIAMS opened a Citizens Bank account for J.W.  On May 2, 2018, J.W.'s Citizens Bank account had a balance of $225,694.42.  On May 15, 2018, J.W.'s Citizens Bank account had a balance of $16,522.91.

*Empowerment Homes*

53.     In an invoice dated April 13, 2018, Empowerment Homes requested a $92,866.70 payment from Guardian & Associates for  J.W.'s residence fees.  The invoice claimed that J.W. lived in an Empowerment Homes residence from February 13, 2016, through May 2018.  RASHAD registered Empowerment Homes on December 19, 2017, and opened its first bank account on January 8, 2018.  J.W. did not live in an Empowerment Home facility until about April 2018.

54.     On or about May 2, 2018, WILLIAMS caused a $92,866.70 check to be issued from J.W.'s Citizens Bank account to Empowerment Homes for "[J.W.] Resident Charges PAID IN FULL." The check was deposited into the

Empowerment Homes Bank of America bank account on which RASHAD was the sole signatory.

55.     The $92,866.70 check was not used for the benefit of J.W. and was fraudulently used to benefit RASHAD and WILLIAMS.

*Chick's Bar Purchase*

56.     Also on or about May 2, 2018, WILLIAMS caused a $70,000 check to be issued from J.W.'s Citizens Bank account to the Bradley Law Center. BRADLEY-BASKIN deposited the $70,000 check into a Bradley Law Center Citizens Bank account.

57.     Minutes after depositing the $70,000 check, BRADLEY-BASKIN caused a $70,000 check to be issued from the Bradley Law Center Citizens Bank account to an individual, M. F. The $70,000 check was used as a down payment on a land purchase agreement for Chick's Bar located at 18550 West Warren Avenue, Detroit, MI in the name of a holding company. BRADLEY BASKIN, while not listed as the owner of the holding company, later became the beneficial owner of the bar.

58.     After Chick's Bar was damaged by a car crash on September 15, 2019, BRADLEY-BASKIN filed an insurance claim identifying herself as the owner of Chick's Bar. BRADLEY and BRADLEY-BASKIN received two insurance settlement checks totaling more than $99,000, made payable to the holding

17

company. The first settlement check for $14,500 was endorsed by BRADLEY-BASKIN and deposited into the ATTY Avery J Bradley Citizens Bank. On February 29, 2024, BRADLEY-BASKIN deposited the second settlement check for $85,270.40 into the Bradley Law Center PLLC IOLTA Huntington Bank account.

59.    On or about March 5, 2024, BRADLEY-BASKIN caused three checks to be issued from the Bradley Law Center PLLC IOLTA account at Huntington Bank for a total of $54,250. The checks were used to pre-pay a year's rent on Bradley-Baskin's residence in Detroit.

60.    The purchase of Chick's bar with J.W.'s money was thus not used to benefit J.W. It was used to benefit BRADLEY-BASKIN and BRADLEY.

.

### $54,015 Check

61.    On May 14, 2018, WILLIAMS caused a $54,015 check to be issued from J.W.'s Citizens Bank account to Company 1, owned by unindicted co-conspirator 1. Unindicted co-conspirator 1 made six cash withdrawals totaling $30,400 from Company 1's account between May 24, 2018, and July 20, 2018. The $54,015 check was not used for the benefit of J.W. and was fraudulently used to benefit unindicted co-conspirator 1.

Case 2:26-cr-20045-MFL-APP   ECF No. 1, PageID.88   Filed 01/28/26   Page 19 of 52

**Theft from E.V.**

62.     On November 29, 2018, Guardian & Associates accepted appointment as
guardian for E.V. On March 7, 2019, Guardian & Associates accepted appointment
as conservator for E.V.

*Lawsuit Settlement*

63.     On or about April 2, 2019, WILLIAMS and BRADLEY-BASKIN signed a
petition requesting the WCPC to approve a $312,000 motor vehicle settlement with
net proceeds of $203,692.93 going to E.V.

64.     On May 14, 2019, the WCPC approved the settlement.

65.     On or about May 17, 2019, WILLIAMS and BRADLEY endorsed a
$312,500 settlement check and BRADLEY deposited it into a Bradley Law Center
PLLC Citizens Bank account. BRADLEY paid litigation and attorney fees related
to E.V.'s motor vehicle settlement.

66.     On or about June 4, 2019, BRADLEY opened an ATT Avery J Bradley
IOLTA Citizens Bank account. On June 8, 2019, BRADLEY withdrew funds from
Bradley Law Center PLLC Citizens Bank account and deposited a $171,403.64
check into ATT Avery J Bradley IOLTA Citizens Bank account.

67.     On or about December 11, 2019, BRADLEY caused a check to be issued to
D&A Investors for $42,978.88 from ATT Avery J Bradley's IOLTA Citizens Bank
account, leaving a balance of $111,897.78. This check represents the final payment

19

for Chick's Bar. D&A Investors, owned by M. F., had owned the Chick 's Bar at

18550 West Warren Avenue.

68.    On July 6, 2020, E.V. died.

69.    On or about July 8, 2020, BRADLEY caused a $140,300 check to be issued

from ATT Avery J Bradley's IOLTA Citizens Bank account. WILLIAMS

deposited the $140,300 check into the Estate of E.V.'s Citizens Bank account.

70.    On or about January 6, 2021, WILLIAMS and BRADLEY signed a petition

to approve accountings to the WCPC. The accountings listed E.V.'s only asset as a

Comerica bank account with $1,344.10. The petition was filed with the WCPC on

February 1, 2021.  On April 1, 2021, the WCPC approved the accountings and

discharged Guardian & Associates as conservator for E.V.

71.    On or about May 4, 2021, WILLIAMS   caused to be issued a $137,312.97

check to L. V., a purported relative of E.V., which represented the balance of the

money in E.V.'s Citizens Bank account   That same day, notwithstanding the fact

that the check was issued to a purported relative of E.V., BRADLEY deposited the

check into the Bradley Law Center PLLC Citizens Bank account.  BRADLEY

caused a $137,312.97 check to be issued from the Bradley Law Center PLLC

Citizens Bank account to Sims Residential Holdings, which is owned by

RASHAD.  On or about June 23, 2021, RASHAD deposited the $137,312.97

check into a newly opened Bank of America account for Sims Residential

Holdings, signatory DWIGHT H. RASHAD.

72.     None of the $203,692.93 net settlement proceeds were used for the benefit

of E.V., or any relative or heir of E.V. The money was fraudulently used to benefit

WILLIAMS, RASHAD, and BRADLEY.

### Thefts from E.C.

73.     On or about March 13, 2017, the WCPC appointed Guardian & Associates

as conservator for E.C. On or about April 6, 2017, the WCPC appointed Guardian

& Associates as guardian for E.C.

#### *Empowerment Homes*

74.     On or about March 20, 2018, WILLIAMS caused a $33,198.28 check to be

issued from E.C.'s Citizens Bank account to "Empowered Homes" with the memo

reading "Assisted Living." RASHAD deposited the check in the Bank of America

account for Empowerment Homes. E.C. did not live in an Empowerment Home.

As court appointed guardian, WILLIAMS paid monthly residence fees for E.C. to

live at other facilities.

75.     On or about April 5, 2018, the WCPC appointed BRADLEY to replace

Guardian & Associates as conservator for E.C. Guardian & Associates remained as

guardian for E.C.

76.     On or about May 22, June 5, and June 13, 2018, WILLIAMS filed three versions of accountings for Guardian & Associates' time as conservator for E.C. The accountings listed payments to Medilodge and Maples Heights. None of the accountings listed the $33,198.28 paid to Empowerment Homes.

77.     The $33,198.28 check was not used for the benefit of E.C. WILLIAMS fraudulently issued the check to benefit RASHAD.

*$9,683 Settlement*

78.     On or about September 28, 2018, WILLIAMS withdrew $9,683 in cash from E.C.'s Citizens Bank account. In his accounting, BRADLEY listed an "Invoice Settlement re: M. V." for $9,683. BRADLEY did not include an invoice with his accounting. M.V. denied performing any work for E.C., or receiving the $9,683 payment.

79.     The $9,683 was not used to benefit E.C. WILLIAMS fraudulently used the cash to benefit WILLIAMS and BRADLEY.

*Andrea Bradley-Baskin's Rent Payment, Westland*

80.     On or about April 2, 2019, BRADLEY caused to be issued a $4,460 check to ASR Properties from E.C.'s Citizens Bank account. ASR Properties owned a house on Shelby Drive in Westland, MI, which BRADLEY-BASKIN was renting.

81.     BRADLEY did not list the payment to ASR Properties in his accounting of E.C.'s estate to the WCPC.

82.    The $4,460 check was not used for the benefit of E.C. BRADLEY

fraudulently issued the check to benefit BRADLEY-BASKIN.

### Thefts from C.C.

83.    On or about April 2, 2018, the WCPC appointed Guardian & Associates as

guardian for C.C., E.C.'s son. On or about April 25, 2019, the WCPC appointed

Guardian & Associates as conservator for C.C.

*Fraudulent home improvement, $9,000*

84.    On or about May 17, 2019, WILLIAMS withdrew $9,000 cash from the

C.C.'s Citizens Bank account. WILLIAMS and BRADLEY signed an accounting

that listed a $9,000 payment to "(clerence (sic) construction –

waterproof/excavate)." When a relative of C.C. questioned WILLIAMS about the

spending, WILLIAMS provided a fake proposal form from Clerence Construction

which listed a company address that doesn't exist and the phone number that was

not assigned to any user s of the date of the proposal.    These improvements did

not occur.

85.    The $9,000 was not used to benefit E.C. WILLIAMS fraudulently used the

cash to benefit WILLIAMS.

*Fraudulent appliances, $6,123.26*

86.    On or about June 4, 2019, WILLIAMS withdrew $6,123.26 cash from

C.C.'s Citizens Bank account. WILLIAMS and BRADLEY signed an accounting

that listed a $6,123.26 payment to "Terry's home improvement – haul away old – install new." WILLIAMS provided an invoice for washer, dryer, stove, and air conditioner hook up and haul away from Terry's Home Improvement to one of C.C.'s relatives. The phone number listed on the invoice belonged to T. R.  T. R. stated that he did not replace the appliances and did not receive a payment of $6,123.26.

87.    The $6,123.26 was not used to benefit E.C. WILLIAMS fraudulently used the cash to benefit WILLIAMS.

*Fraudulent $30,000 check*

88.    On or about June 30, 2020, WILLIAMS caused a $30,000 check to be issued from C.C.'s Citizens Bank account to "Avery J. Bradley." BRADLEY deposited the check in the ATT Avery J Bradley IOLTA Citizens Bank account. On or about July 2, 2024, WILLIAMS and BRADLEY signed and filed an accounting for C.C.'s estate with the WCPC falsely listing the $30,000 as "Refund to the estate of [E.C] (mother estate)." E.C.'s estate never received of the $30,000.

89.    The $30,000 check was not used for the benefit of E.C. or C.C. WILLIAMS fraudulently issued the check to benefit BRADLEY.

*Sale of E.C.'s and C.C.'s home*

90. On or about July 26, 2022, the Estate of C.C., through WILLIAMS, and the estate of E.C., through BRADLEY, sold 1854 O'Connor to Sims Residential, a company owned by RASHAD, for $25,000.

91. WILLIAMS and BRADLEY did not disclose the relationship that WILLIAMS had with RASHAD to the WCPC when seeking court approval for the sale. The WCPC approved the sale without knowing that the owner of Sims Residential, RASHAD, had a relationship with WILLIAMS. The State Equalized Value for the property at the time was $31,700, making its estimated value about $63,400.

## Theft from B.P.

92. On or about January 27, 2020, the WCPC appointed Guardian & Associates as guardian for B.P. On or about July 6, 2020, the WCPC appointed Guardian & Associates as conservator for B.P.

93. B.P. died on June 20, 2023.

94. On July 11, 2023, WILLIAMS caused a $20,010.50 check to be issued from B.P.'s Citizens Bank account payable to the Estate of B.P.

95. On July 13, 2023, BRADLEY and BRADLEY-BASKIN endorsed the $20,010.50 check payable to the Estate of B. P. and it was deposited in Avery Bradley ATT and Counselor at Law Comerica Bank IOLTA account. BRADLEY

then withdrew $20,010.50 cash from his Comerica IOLTA bank account. That same day, BRADLEY deposited $19,910 cash at a Citizens Bank along with $8,025 in attorney fees checks from wards payable to ANDREA BRADLEY-BASKIN. BRADLEY exchanged the cash and checks for $2,655.34 in cash and a cashier's check for $25,179.66 made payable to Crest Ford.

96.    On July 13, 2023, BRADLEY-BASKIN registered a new 2023 Ford Expedition King Ranch 4X4. BRADLEY-BASKIN paid a two-year lease up-front with the check for $25,179.66 at Crest Ford.

97.    On October 24, 2023, BRADLEY filed an accounting with the WCPC that included the $20,010.50 as money paid to Heritage Manor on behalf of B.P. The $20,010.50 check was not used for the benefit of B.P. WILLIAMS fraudulently issued the check to enable BRADLEY-BASKIN to lease a vehicle.

### Theft from C.A.

98.    On or about March 8, 2021, the WCPC appointed Guardian & Associates as guardian for C.A.

### *Empowerment Homes*

99.    WILLIAMS, acting on behalf of C.A. as his court appointed guardian, and RASHAD signed a rental agreement with Empowerment Homes dated March 9, 2021, for C.A. to live at 3609 Theodore, Detroit, MI., an Empowerment Homes property

100.   On or about April 14, 2022, WILLIAMS caused a $12,500 check to be issued from C.A.'s Citizens Bank account to Empowerment Homes for "Resident Charge Mar-July '21." RASHAD deposited the check in the Bank of America account for Empowerment Homes.

101.   From March through July 2021, C.A. did not live at an Empowerment Homes facility.  C.A. lived with his brother, A.A., at a home on Elm Street, Taylor, Michigan.  C.A. never lived at 3609 Theodore.

102.   Invoices from a transportation company in May 2021, which WILLIAMS paid as court appointed guardian, show C.A. being transported from his home on Elm Street to a medical facility, and then back to Elm Street.

103.   On June 3, 2021, WILLIAMS, acting on behalf of C.A. as his court appointed guardian, caused to be issued a $800 check to A.A. for "Resident Care/food" to pay for C.A.'s living expenses at A.A.'s home from C.A.'s Citizens Bank account.

104.   A rental agreement for C.A. with an Adult Living Facility listed his move-in date as July 1, 2021. In an invoice dated July 1, 2021, a transportation company charged C.A. to transport C.A. from Elm Street to 21022 Champaign St, Taylor, MI with the note "Picked up [C.A.] and personal belongings and relocated to new home."

105. The $12,500 check was not used for the benefit of C.A. WILLIAMS fraudulently issued the check to benefit RASHAD.

*$1,300 check*

106. On or about August 31, 2021, WILLIAMS deposited a $1,300 check made payable for the benefit of C.A. into Guardian & Associates' Citizens Bank account. The $1,300 check was not used for the benefit of C.A. WILLIAMS fraudulently deposited the check to benefit herself.

**Theft from P.R.**

107. On or about September 2, 2021, the WCPC appointed Guardian & Associates as guardian for P.R. On or about November 3, 2021, the WCPC appointed Guardian & Associates as conservator for P.R.

108. On or about March 17, 2022, WILLIAMS caused a $74,704.74 check to be issued from the P.R.'s Citizens Bank account to Boulevard Manor.

109. On or about March 22, 2022, WILLIAMS endorsed the $74,704.74 check and wrote "not used for intended purpose" on the back of the check. WILLIAMS exchanged the $74,704.74 check for two separate checks, a $54,704.74 check issued to the Estate of P.R., and a second check for $20,000 issued to Boulevard Manor.

110. On or about March 23, 2022, BRADLEY-BASKIN endorsed and deposited the $54,704.74 check payable to the Estate of P.R. into a Bradley Law Center

IOLTA account at Huntington Bank, which she had opened the same day. BRADLEY-BASKIN was the only signatory on the Huntington Bank account.

111.   On or about March 25, 2022, BRADLEY-BASKIN withdrew $27,325.37 in cash from the Bradley Law Center Huntington Bank account. On the same day, a receipt for a partial distribution was drafted from the Estate of P.R. for $27,352.37. The receipt is signed by BRADLEY-BASKIN and is also purportedly signed by Mrs. P.R.   The receipt was never filed with the WCPC and P.R.'s wife never received any money from P.R.'s estate.

112.   P.R.'s daughter, S.R., asked Guardian & Associates about P.R.'s insurance settlement, and was informed that all of the money was used to pay P.R.'s medical expenses.

113.   On or about May 25, 2022, BRADLEY-BASKIN deposited a $4,288.48 check payable to the Estate of P.R. into the Bradley Law Center Huntington Bank IOLTA account.

114.   From April 11, 2022, to May 31, 2022, BRADLEY-BASKIN made eleven cash withdrawals from the Bradley Law Center Huntington Bank IOLTA account totaling $31,550.  Except for a $100 deposit made on April 15, 2022, the only funds deposited into this Bradley Law Center Huntington Bank IOLTA account had been checks payable to the Estate of P.R.

115.   On or about May 3, 2023, WILLIAMS and BRADLEY-BASKIN signed and filed with the WCPC a Petition to Allow Accounts for the Estate of P.R.  The filing lists two payments to Heritage Manor, one for $20,000 and one for $54,704.74 issued on the same day.  The filing does not list the $54,704.74 deposit or the $4,288.48 deposit that BRADLEY-BASKIN made to the Bradley Law Center Huntington Bank IOLTA account.  BRADLEY-BASKIN was paid $500 for reviewing the filing.  In total, BRADLEY-BASKIN was paid $5,562.50 in attorney fees for her legal work on the Estate of P.R.

116.   The two checks totaling $58,993.22 were not used for the benefit of P.R. WILLIAMS fraudulently issued the checks to benefit BRADLEY-BASKIN.

### Theft from J.B.

117.   On or about November 13, 2018, the WCPC appointed Guardian & Associates as guardian for J.B.

118.   J.B. died on August 23, 2020.

119.   On August 25, 2020, WILLIAMS closed the Comerica Bank account for the Estate of J.B. WILLIAMS withdrew the balance in a $5,158.49 check made payable to the "Estate of [J.B.]."

120.   On August 28, 2020, WILLIAMS deposited the $5,158.49 check into Guardian & Associates' Citizens Bank account. The $5,158.49 check was not used

for the benefit of J.B. WILLIAMS fraudulently issued the check to benefit WILLIAMS.

### Theft from J.G.

121.  On or about November 8, 2019, the WCPC appointed Guardian & Associates as guardian for J.G.

122.  On June 14, 2020, WILLIAMS caused a $2,500 check to be issued to AVERY J. BRADLEY for Attorney Fees. J.G.'s file contained a June 12, 2020, invoice from the Bradley Law Center for services including preparing an Annual Report and obtaining Letters of Authority in November 2020.

123.  On July 12, 2020, J.G. was arrested for Assault with Intent to Murder. J.G. was detained. J.G. pleaded guilty and remains in prison.

124.  On July 18, 2022, WILLIAMS caused a $6,400 check to be issued from J.G.'s Citizens Bank account to Empowerment Homes with memo "Room & Board (Nov'19-Jun'20)." J.G. did not reside in an Empowerment Home from November 2019 to June 2020. RASHAD deposited the check into the Empowerment Homes Bank of America account. The $6,400 check was not used for the benefit of J.G. WILLIAMS fraudulently issued the check to benefit RASHAD.

125.  On August 10, 2022, WILLIAMS caused a $10,500 check to be issued to the Bradley Law Center from J.G.'s Citizens Bank account.  BRADLEY deposited the

check in ATTY Avery J Bradley IOLTA account at Citizens Bank.  An undated document on WILLIAMS' laptop that was created by WILLIAMS on January 25, 2024, is titled "Statement of Services." The services involve monitoring J.G.'s criminal case, including conferring with J.G.'s criminal attorneys. Neither of J.G.'s appointed criminal attorneys remember communicating with BRADLEY. The charges duplicate many of the services billed for by Guardian & Associates. The statement also listed a "face to face with client."  J.G. stated that he never met BRADLEY.

126.    The $10,500 check was not used to benefit J.G.  It was fraudulently issued by WILLIAMS to benefit BRADLEY.

### Theft from N.D.

127.    On or about May 4, 2021, WCPC appointed Guardian & Associates as guardian for N.D.

128.    On or about March 1, 2023, WILLIAMS caused to be issued a $5,000 check from N.D.'s Citizens Bank account.

129.    On or about April 2, 2023, WILLIAMS caused to be issued a $4,000 check from N.D.'s Citizens Bank account.

130.    On or about September 27, 2023, WILLIAMS exchanged those two checks for an official check for $9,000 payable to Empowerment Homes with a memo "[N.D.] Care Room & Board April '21 – July'21."

131.   On or about September 28, 2023, RASHAD deposited the $9,000 check into Empowerment Homes Bank of America account.

132.   N.D. did not live in an Empowerment Homes facility from April 2021 to July 2021.

133.   The $9,000 check was not used for the benefit of N.D. WILLIAMS fraudulently issued the check for the benefit of RASHAD.

### Theft from T.A. (1)

134.   On or about June 17, 2021, the WCPC appointed Guardian & Associates as guardian for T.A.

135.   On September 28, 2021, WILLIAMS caused a $23,500 check to be issued from T.A.'s Citizen Bank account to Empowerment Homes with memo "CARE/ROOM & BOARD (MAR'20-MAY'21)".  RASHAD deposited the check in the Empowerment Homes Bank of America account.

136.   T.A. did not live in an Empowerment Homes facility from March 2020 to May 2021. On April 13, 2021, a mental health facility referred T.A. for appointment of a guardian.  The form stated that T.A. had been staying at its facility from November 2020.

137.   The $23,500 check was not used for the benefit of T.A.  WILLIAMS fraudulently issued the check for the benefit of RASHAD.

### Theft from T.A. (2)

138. On or about September 26, 2018, the WCPC appointed Guardian & Associates as guardian for T.A.

139. On November 21, 2018, WILLIAMS caused a $14,000 check to be issued from the T.A.'s Citizens Bank account with memo "Dec '17 thru Sept '18 11 MO's @ 1500/mo. Less discount PAID IN FULL." On or about November 27, 2018, RASHAD deposited the check in the Empowerment Homes Bank of America account.

140. T.A. did not live at an Empowerment Homes facility from December 2017 to September 2018. The petition for appointment of guardian filed on August 24, 2018, listed T.A. as being homeless.

141. The $14,000 check was not used for the benefit of T.A. WILLIAMS fraudulently issued the check for the benefit of RASHAD.

**Theft from M.H.**

142. On or about July 22, 2020, the WCPC appointed Guardian & Associates as guardian for M.H.

143. On June 29, 2023, WILLIAMS caused a $13,300 check to be issued from M.H.'s Citizens Bank account to Empowerment Homes with memo "Residential back pay Sept '21-March '23."

144. On June 29, 2023, RASHAD deposited the $13,300 check in Empowerment Homes Bank of America account.

145. On April 26, 2023, Guardian & Associates issued a detailed address history for M.H. for 2017 through April 2023 as an attachment to a Social Security filing. According to the address history prepared by Guardian & Associates, M.H. did not live in an Empowerment Homes facility from September 2021 through March 2023.

146. The $13,300 check was not used for the benefit of M.H. WILLIAMS fraudulently issued the check for the benefit of RASHAD.

**Theft from N.A.**

147. On or about May 4, 2021, the WCPC appointed Guardian & Associates as guardian for N.A.

148. On May 31, 2023, WILLIAMS issued a $6,500 check from N.A.'s Citizens Bank account payable to the Estate of N.A.

149. On September 13, 2023, WILLIAMS deposited the $6,500 check into the Citizens Bank account of Guardian & Associates.

150. Guardian & Associates was not entitled to the funds, and the deposit was not disclosed to the WCPC.

151. The $6,500 check was not used for the benefit of N.A. but was fraudulently stolen by WILLIAMS.

**Theft from K.K.**

152. On May 21, 2020, N. L., a home provider, petitioned the WCPC for appointment of a guardian. K.K. had not previously had a guardian. On or about July 23, 2020, the WCPC appointed Guardian & Associates as guardian for K.K.

153. K.K. resided at Landers & Landers Home for the Aged until April 14, 2021, when Guardian & Associates moved K.K. to a nursing facility with more supervised care.

154. On April 23, 2021, WILLIAMS caused a check for $8,635 to be issued from K.K.'s Citizens Bank account to Empowerment Homes for "Est Kenneth Keyes Resident Fees / Paid in Full." Keyes did not reside in an Empowerment Home. RASHAD deposited the check into the Empowerment Homes Bank of America account on April 26, 2021. The $8,635 check was not used for the benefit of K.K. WILLIAMS fraudulently issued the check to benefit RASHAD.

155. On or about December 29, 2022, WILLIAMS, as fiduciary, and BRADLEY-BASKIN, as attorney, signed and filed an accounting with the WCPC that listed the $8,635 payment under Landers & Landers. The $8,635 payment to Empowerment Homes was never accounted for in the filing with the WCPC.

### Theft from S.K.

156. On or about November 15, 2018, Guardian & Associates was appointed as temporary guardian, and on or about November 29, 2018, Guardian& Associates was appointed full guardianship for S.K. by the WCPC.

157.   From about February 2021 through June 2023, WILLIAMS issued monthly checks to several facilities for care and housing of S.K.

158.   On or about June 25, 2023, S.K. died while living at Heritage Manor on Grand River, in Detroit, Michigan.  Detroit Police responded to Heritage Manor and filed a report documenting S.K.'s death.

165. On June 30, 2023, WILLIAMS issued a check from S.K.'s Citizens Bank account for $2,759.27, payable to Empowerment Homes.  The amount was the remaining balance in the account, after Guardian & Associates collected its fees. RASHAD deposited the check into his Bank of America account.

166. S.K. never lived at an Empowerment Homes facility.  The $2,759.27 check was not used for the benefit of S.K. but was fraudulently stolen by WILLIAMS to benefit RASHAD.

### Theft from F.J.

159.   On or about July 8, 2019, the WCPC appointed Guardian & Associates as guardian for F.J. On or about July 29, 2019, the WCPC appointed Guardian & Associates as conservator for F.J.

160.   On or about August 29, 2019, F.J.'s property at 5365 West Outer Drive, Detroit, MI was sold at a sheriff's sale of a mortgage for $31,664.24.  BRADLEY-

BASKIN filed a motion in the WCPC to quiet title and to vacate the sheriff's sale. The sale was vacated, and the property was returned to F.J.

161.   On April 29, 2020, BRADLEY-BASKIN, on behalf of Guardian & Associates, filed an Emergency Petition for Sale of Real Estate in the WCPC regarding 5365 West Outer Drive. BRADLEY-BASKIN attached a Land Purchase Agreement to the Emergency Petition which contained a signed offer by J.H. to purchase 5365 West Outer Drive for $25,000. J.H. is BRADLEY-BASKIN's half-brother.  BRADLEY-BASKIN's Petition stated "[there was a recent erroneous sale of the home at a foreclosure action, in August of 2019, which has been set aside. At that time the home was valued at and sold for $16,500, and there have been no improvements or material changes to increase the value of the home, which makes the current offer to purchase for $25,000 in line with the prudent investor rule as it will yield a profit to the estate." The Petition further stated that "[t]here is currently an offer to purchase the property that could be lost if the petition to sale the real estate is not granted." Neither BRADLEY-BASKIN nor WILLIAMS disclosed that the current offer was to sell the home to a close relative of BRADLEY-BASKIN, nor that the actual sale price of the home at the sheriff's sale was $31,664.24. The WCPC approved the sale.

162.   On May 11, 2020, F.J. died.

163.   Through a deed dated May 14, 2020, WILLIAMS, on behalf of the Estate of F.J., granted 5365 West Outer Drive to J.H. The deed listed BRADLEY as the drafter.

164.   On December 21, 2020, BRADLEY-BASKIN used 22 checks totaling $26,500 for "Attorney Fees" that had been issued from wards' bank accounts to cause a $25,000 check to be issued to the Estate of F.J. BRADLEY-BASKIN used the $25,000 to purchase F.J.'s home which had been titled in her half-brother, J.H.'s name.  J.H. never paid any money to purchase the house.  J.H. never lived in the house or paid property taxes.  Later, in March of 2024, J.H. quit claimed 5365 West Outer Drive to CAB Realty, a company owned by BRADLEY-BASKIN's spouse for $1.00.

165.   A little more than a year later, on or about April 25, 2025, CAB Realty sold the property for $140,000.

### Theft from M.J.

166.   On or about April 4, 2018, the WCPC appointed Guardian & Associates as guardian for M.J. On or about July 24, 2018, the WCPC appointed Guardian & Associates as conservator for M.J.

167.   On January 6, 2021, BRADLEY-BASKIN and WILLIAMS filed an

Emergency Petition Regarding Real Estate/Dwelling to sell M.J.'s home. The

petition proposed to sell the home for $112,000 to Sims Residential Holdings,

owned by RASHAD. BRADLEY-BASKIN and WILLIAMS failed to disclose

WILLIAMS' relationship with RASHAD to the WCPC. The WCPC approved the

sale.

168.   On January 29, 2021, WILLIAMS deposited a $75,000 check from Sims

Residential Holdings along with $37,000 in cash into the Citizens Bank account for

M.J.

169.   On April 23, 2021, WILLIAMS signed the deed on behalf of the Estate of

M.J. quit claiming the property to Sims Residential for $112,000. On May 17,

2021, RASHAD signed a deed conveying the property to third-party buyers for

$193,000.

170.   On February 3, 2021, WILLIAMS caused a $11,401 ACH transfer from

M.J.'s Citizens Bank account to the Guardian & Associates Citizens Bank account.

171.   On June 8, 2021, a Petition to Allow Accounts which lists expenses and

income for M.J. filed by BRADLEY-BASKIN and WILLIAMS with the WCPC.

BRADLEY-BASKIN and WILLIAMS listed an $11,401 payment to Guardian &

Associates as a "Christmas – Reimbursement" expense.   Bank records show M.J.

receiving only a $60 a month allowance from Guardian & Associates and no $11,401 payment.

172. On February 15, 2021, the WCPC approved the sale of M.J.'s vehicle to Sims Residential for $500.

173. The Estate of M.J. paid BRADLEY $1,550 in attorney fees; the Bradley Law Center $500 in attorney fees; and BRADLEY-BASKIN $7,812.50 in attorney fees.

**Theft from L.B.**

174. On or about September 6, 2018, the WCPC appointed Guardian & Associates as guardian for L.B.

175. L.B. owned a 1998 Lincoln Continental. From February 1, 2019, to March 13, 2021, Williams caused checks to be issued from L.B.'s Citizens Bank account for $7,350 to Empowerment Homes for vehicle/storage. The check memos and invoices from L.B.'s file stated that the vehicle storage fee was $150 per month. During this 26-month, L.B. paid Empowerment Homes for 49 months of storage. For example, an Empowerment Homes invoice dated February 6, 2020, billed $2,850 for 19 months of "Vehicle (1998 Lincoln)/Storage (August 2018 to February 2020)." On October 19, 2019, WILLIAMS had caused a $1,050 check to be issued from L.B.'s Citizens Bank account to Empowerment Homes for "Storage/7 months."

176.    On or about June 1, 2020, Williams paid $1,250 for repairs to L.B.'s vehicle. WILLIAMS reimbursed Guardian & Associates from L.B.'s Citizens Bank account for the cost of the repairs.

177.    On November 13, 2023, WILLIAMS sent an e-mail to L.B.'s niece in which WILLIAMS wrote about discarded property "1 vehicle (Was not registered to [L.] so we were unable to take possession)." The current whereabouts of L.B.'s vehicle are unknown.

178.    On December 17, 2020, WILLIAMS caused $2,216 to be transferred from L.B.'s Citizens Bank account to the Guardian & Associates Citizens Bank account. The payment covered expenses for a 10X30 storage unit from May 2020 to December 2020 – $277 a month. From January 2021 to October 2023, WILLIAMS caused $277 to be transferred each month from L.B.'s Citizens Bank account to the Guardian & Associates Citizens Bank account for the storage unit. Records from the storage facility show WILLIAMS terminated the rental on December 22, 2021. WILLIAMS caused $6,094 to be transferred from L.B.'s Citizens Bank account to the Guardian & Associates Citizens Bank account after WILLIAMS terminated the rental.

179.    WILLIAMS caused the Estate of L.B. to issue checks for attorney fees totaling $19,500 to BRADLEY-BASKIN and $3,000 to the Bradley Law Center.

**Economic Impact Payments**

180.   During the COVID pandemic, the federal government issued Economic Impact Payment checks to provide economic relief to individuals suffering the effects of the epidemic, including incapacitated wards.  WILLIAMS deposited twenty-two Economic Impact Payment checks, totaling more than $20,000, belonging to wards into the Guardian and Associates Citizens Bank account. WILLIAMS never provided the funds to the wards or used the funds for their benefit.  WILLIAMS fraudulently deposited the checks into the Guardian and Associates bank account and kept the funds.

**Nursing Home Trust Checks**

181.   Nursing homes offer residents the option of setting up a trust fund – a financial account into which money can be deposited to pay for incidental expenses which are not covered by monthly care and housing fees.  Residents of these homes retain ownership of their respective funds in the trust and have the right to access them at any time to pay for uncovered expenses.  When a resident moves out of the nursing home, or dies, the balance of the trust fund gets paid out to the resident or their heirs.

182.   During the course of this conspiracy, WILLIAMS received more than 60 trust fund payout checks totaling more than $20,000 for her wards.  WILLIAMS deposited checks with refunds from the nursing home trust accounts of wards into

Guardian and Associate's Citizens Bank account. WILLIAMS fraudulently used the funds for her benefit, not her wards.

All in violation of Title 18, United States Code, Section 1349.

## COUNT TWO
### 18 U.S.C. § 1343
### Wire Fraud

D-3    AVERY BRADLEY

1.     The General Allegations section of this Indictment is realleged and incorporated by reference as though fully set forth herein.

2.     From at least in or around May 2022 through at least in or around 2023, in the Eastern District of Michigan, and elsewhere, defendant **AVERY BRADLEY,** aided and abetted by others known and unknown, did knowingly, willfully, and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing such pretenses, representations, and promises were false and fraudulent when made, transmit and cause to be transmitted, by means of wire, radio, and television communication, writings, signals, pictures, and sounds in interstate and foreign commerce for the purposes of executing such scheme and artifice.

## PURPOSE OF THE SCHEME AND ARTIFICE TO DEFRAUD

3.     The purpose of the scheme and artifice to defraud was for BRADLEY to enrich himself by embezzling funds and using false and fraudulent

44

representations, pretenses, and promises to obtain and keep money from the estate of a decedent to which he was not entitled.

## THE SCHEME AND ARTIFICE TO DEFRAUD

183.    On or about May 25, 2022, the WCPC appointed BRADLEY as Successor Personal Representative for the decedent Estate of W.K. As Personal Representative for the Estate of W.K., it was BRADLEY's duty to gather assets, pay outstanding bills, and disperse remaining assets to heirs in accordance with W.K.'s will.

184.    In December 2022, BRADLEY issued checks to 37 heirs of W.K. and Attorney Michael Caine, PLLC, totaling more than $740,000 from Estate of W.K.'s Comerica Bank account.

185.    On June 27, 2023, BRADLEY caused a $17,437.39 check to be issued from the Estate of W.K.'s Comerica Bank account to University of Detroit Mercy. On July 13, 2023, BRADLEY deposited the $17,437.39 check into the Comerica Bank IOLTA account of Avery Bradley ATT and Counselor at Law. BRADLEY never dispersed the funds for the benefit of the Estate of W.K.

186.    On June 27, 2023, BRADLEY transferred $60,000 from the Estate of W.K.'s Comerica Bank account into the Comerica Bank IOLTA account for Avery J. Bradley ATT and Counselor at Law. BRADLEY never dispersed any of these funds for the benefit of the Estate of W.K.

187.   On June 27, 2023, BRADLEY transferred $261,072.33 from the Estate of

W.K.'s Comerica Bank account to the Comerica Bank IOLTA account for Avery

Bradley ATT and Counselor at Law. On July 13, 2023, BRADLEY caused to be

issued a check from Comerica Bank IOLTA account for Avery Bradley ATT and

Counselor at Law for $185,963.62 to the University of Detroit Mercy in

accordance with W.K.'s will. The check was deposited into the University of

Detroit Mercy's Fifth Third bank account.  BRADLEY never dispersed any of the

remaining funds from W.K.'s Comerica Bank account for the benefit of the Estate

of W.K.

188.   On June 27, 2023, BRADLEY withdrew the remaining $9,000 from the

Estate of W.K.'s Comerica Bank account.

189.   In furtherance of the scheme and artifice described above, and to accomplish

its purpose, BRADLEY did knowingly transmit and cause to be transmitted, by

means of wire, radio, and television communication, writings, signals, pictures,

and sounds in interstate commerce.

190.   All in violation of Title 18, United States Code, Sections 1343 and 2.

**COUNT THREE**
18 U.S.C. § 1957
Money Laundering

D-3 AVERY BRADLEY

191.   On or about May 10, 2021, in the Eastern District of Michigan, defendant

AVERY BRADLEY, did knowingly engage in a monetary transaction by through

or to a financial institution, affecting interstate or foreign commerce, in criminally

derived property of a value greater than $10,000, that is withdrawal the sum of $

137,312.97 in a monetary instrument from an account at Citizens Bank, such

property having been derived from a specified unlawful activity, that is, the funds

were embezzled for the Estate of E.V., in violation of Title 18, United States

Codes, Sections 1957 and 2.

## COUNT FOUR
18 U.S.C. § 1957
Money Laundering

### D-4 DWIGHT RASHAD

192.   On or about June 23, 2021, in the Eastern District of Michigan, defendant

DWIGHT RASHAD, did knowingly engage in a monetary transaction by through

or to a financial institution, affecting interstate or foreign commerce, in criminally

derived property of a value greater than $10,000, that is the deposit of the sum of $

137,312.97 in a monetary instrument into an account at Bank of America, such

property having been derived from a specified unlawful activity, that is, the funds

were embezzled for the Estate of E.V., in violation of Title 18, United States

Codes, Sections 1957 and 2.

## COUNT FIVE

18 U.S.C. § 1957
Money Laundering

D-2 ANDREA BRADLEY-BASKIN

D-3 AVERY BRADLEY

193.    On or about July 13, 2023, in the Eastern District of Michigan, defendants

ANDREA BRADLEY-BASKIN and AVERY BRADLEY, did knowingly engage

in a monetary transaction by through or to a financial institution, affecting

interstate or foreign commerce, in criminally derived property of a value greater

than $10,000, that is the deposit of the sum of $ 20,010.50 in a monetary

instrument into an account at Comerica Bank, such property having been derived

from a specified unlawful activity, that is, the funds were embezzled for the Estate

of B.P., in violation of Title 18, United States Codes, Sections 1957 and 2.

## COUNT SIX
18 U.S.C. § 1957
Money Laundering

D-2 ANDREA BRADLEY-BASKIN

D-3 AVERY BRADLEY

194.    On or about July 13, 2023, in the Eastern District of Michigan, defendants

AVERY BRADLEY and ANDREA BRADLEY-BASKIN, did knowingly engage

in a monetary transaction by through or to a financial institution, affecting

interstate or foreign commerce, in criminally derived property of a value greater

48

than $10,000, that is the transfer of U.S. currency and monetary instruments into

the sum of $ 25,179.66 in a monetary instrument, a check payable to Crest Ford,

from an account at Citizens Bank, of which more than $ 10,000 having been

derived from a specified unlawful activity, that is, the funds were embezzled for

the Estate of B.P., in violation of Title 18, United States Codes, Sections 1957 and

2.

**COUNT SEVEN**
**18 U.S.C. § 1001(a)(2)**
**False Statements**

D-2 ANDREA BRADLEY-BASKIN

195.   On or about April 22, 2025, in the Eastern District of Michigan, Southern

Division, ANDREA BRADLEY-BASKIN, in a matter within the jurisdiction of

the Federal Bureau of Investigation Department of Justice, an agency of the United

States, did knowingly and willingly make a false, fictitious, or fraudulent material

statement in which the defendant, ANDREA BRADLEY-BASKIN, denied that she

gave any money to NANCY WILLIAMS to purchase a professional building

situated at 21751 Coolidge Highway, Oak Park, MI 48237, when she knew that she

did, in fact, provide at least $187,000 in checks drawn from her bank accounts to

NANCY WILLIAMS to purchase the building, which said statement the

defendant, ANDREA BRADLEY-BASKIN  then and there knew was false, all in

violation of  Title 18, United States Code, Section 1001(a)(2).

## FORFEITURE ALLEGATIONS
18 U.S.C. § 981 and 28 U.S.C. § 2461

196.   The allegations contained in this Indictment are realleged and incorporated by reference to allege forfeiture under Title 18, United States Code, Section 981(a)(1)(C) together with Title 28, United States Code, Section 2461(c).

197.   Upon being convicted of the offenses in violation of Title 18, United States Code, Section 1343, 1349, or 1956 the defendants shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, which constitutes, or is derived from, proceeds traceable to such violation(s) and, pursuant to Title 18, United States Code, Section 981(a)(1)(C) together with Title 28, United States Code, Section 2461.

198.   Money Judgment: Forfeiture includes, but is not limited to, a forfeiture money judgment against the defendant, in favor of the United States, in a dollar amount representing the total amount of proceeds obtained by the defendant as a result of the offenses of conviction.

199.   Substitute Assets: If the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

   a.  Cannot be located upon the exercise of due diligence;

   b.  Has been transferred or sold to, or deposited with, a third party;

   c.  Has been placed beyond the jurisdiction of the Court;

   d.  Has been substantially diminished in value; or

e. Has been commingled with other property that cannot be subdivided without difficulty;

200.   It is the intent of the United States, pursuant to 21 U.S.C. § 853(p) as incorporated by Title 28, United States Code, Section 2461, to seek to forfeit any other property of the defendant up to the value of the forfeitable property described above.

THIS IS A TRUE BILL.

*s/Grand Jury Foreperson*
Grand Jury Foreperson

JEROME F. GORGON
United States Attorney


*s/John K. Neal*
JOHN K. NEAL
Chief, Anti-Corruption Unit


*s/Robert A. Moran*
ROBERT A. MORAN
Assistant United States Attorney

1. 28 26

51

| United States District Court<br>Eastern District of Michigan | Criminal Case Cover Sheet | Case: **2:26-cr-20045**<br>Assigned To : **Leitman, Matthew F.**<br>Referral Judge: **Patti, Anthony P.**<br>Assign. Date : **1/28/2026**<br>Description: **INDI USA V SEALED MATTER (TM)** |
| --- | --- | --- |

**NOTE: It is the responsibility of the Assistant U.S. Attorney signing this form to complete it accurately in all respects.**

| **Companion Case Information** | | **Companion Case Number:** |
| --- | --- | --- |
| This may be a companion case based upon LCrR 57.10 (b)(4)[1]: | | **Judge Assigned:** |
| ☐Yes   ☒No | | **AUSA's Initials:**   R.A.M |

**Case Title:** USA v. Nancy Williams et al

**County where offense occurred :** Wayne

**Check One:**   ☒Felony   ☐Misdemeanor   ☐Petty

✓ Indictment/____ Information --- **no** prior complaint.
____ Indictment/____ Information --- based upon prior complaint [Case number:
____ Indictment/____ Information --- based upon **LCrR 57.10 (d)** *[Complete Superseding section below]*.

## Superseding Case Information

**Superseding to Case No:** _____   **Judge:** _____

☐ Corrects errors; no additional charges or defendants.
☐ Involves, for plea purposes, different charges or adds counts.
☐ Embraces same subject matter but adds the additional defendants or charges below:

| **Defendant name** | **Charges** | **Prior Complaint (if applicable)** |
| --- | --- | --- |

**Please take notice that the below listed Assistant United States Attorney is the attorney of record for the above captioned case.**

January 28, 2026
Date

Robert A. Moran

Robert A. Moran
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226-3277
Phone:313-226-9553
Fax:
E-Mail address: robert.moran@usdoj.gov
Attorney Bar #:

[1] Companion cases are matters in which it appears that (1) substantially similar evidence will be offered at trial, or (2) the same or related parties are present, and the cases arise out of the same transaction or occurrence. Cases may be companion cases even though one of them may have already been terminated.